# In the United States Court of Federal Claims

No. 17-2057C
(Filed: February 15, 2019)

*****************************************

| | |
|---|---|
| MAINE COMMUNITY HEALTH OPTIONS, * | |
| * | Affordable Care Act; Cost-Sharing |
| Plaintiff, * | Reduction Payments; 42 U.S.C. § 18071; |
| * | Statutory Violation; Implied-in-Fact |
| v. * | Contract; Motion for Summary Judgment, |
| * | RCFC 56; Motion to Dismiss, RCFC |
| THE UNITED STATES, * | 12(b)(6) |
| * | |
| Defendant. * | |

*****************************************

Stephen McBrady, Washington, DC, for plaintiff.

Christopher J. Carney, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Chief Judge

Plaintiff Maine Community Health Options contends that the federal government ceased making the cost-sharing reduction payments to which it and other insurers are entitled under the Patient Protection and Affordable Care Act ("Affordable Care Act"), Pub. L. No. 111-148, 124 Stat. 119 (2010), and its implementing regulations. Currently before the court are plaintiff's motion for summary judgment and defendant's cross-motion to dismiss for failure to state a claim upon which relief can be granted. For the reasons set forth below, the court finds that plaintiff is entitled to recover the unpaid cost-sharing reduction reimbursements. Therefore, it grants plaintiff's motion and denies defendant's motion.

## I. BACKGROUND

### A. The Affordable Care Act

Congress enacted the Affordable Care Act as part of a comprehensive scheme of health insurance reform.[1] See generally King v. Burwell, 135 S. Ct. 2480 (2015). Specifically, the Act includes "a series of interlocking reforms designed to expand coverage in the individual health

---

[1] Seven days after enacting the Affordable Care Act, Congress enacted the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029, which included additional provisions related to health insurance reform.

insurance market." Id. at 2485.  In conjunction with these reforms, the Act provided for the establishment of an American Health Benefit Exchange ("exchange") in each state by January 1, 2014, to facilitate the purchase of "qualified health plans" by individuals and small businesses. 42 U.S.C. §§ 18031, 18041 (2012); accord King, 135 S. Ct. at 2485 (describing an exchange as "a marketplace that allows people to compare and purchase insurance plans").  Qualified health plans can be offered at four levels (bronze, silver, gold, and platinum) that differ based on how much of a plan's benefits an insurer must cover under the plan.[2]  42 U.S.C. § 18022(d)(1).

Among the reforms included in the Affordable Care Act were two aimed at ensuring that individuals have access to affordable insurance coverage and health care:  the premium tax credit enacted in section 1401 of the Act, 26 U.S.C. § 36B (2012), and the cost-sharing reduction program enacted in section 1402 of the Act, 42 U.S.C. § 18071.  "The premium tax credits and the cost-sharing reductions work together:  the tax credits help people obtain insurance, and the cost-sharing reductions help people get treatment once they have insurance." California v. Trump, 267 F. Supp. 3d 1119, 1123 (N.D. Cal. 2017).

## 1. Premium Tax Credit

The first of these two reforms, the premium tax credit, is designed to reduce the insurance premiums paid by individuals whose household income is between 100% and 400% of the poverty line.  See 26 U.S.C. § 36B(c)(1)(A); 42 U.S.C. § 18082(c)(2)(B)(i); accord 26 C.F.R. § 1.36B-2(a) to (b) (2017); 45 C.F.R. § 156.460(a)(1) (2017).  The Secretary of the Department of Health and Human Services ("Secretary of HHS") is required to determine whether individuals enrolling in qualified health plans on an exchange are eligible for the premium tax credit and, if so, to notify the Secretary of the United States Department of the Treasury ("Treasury Secretary") of that fact.  42 U.S.C. § 18082(c)(1).  The Treasury Secretary, in turn, is required to make periodic advance payments of the premium tax credit to the insurers offering the qualified health plans in which the eligible individuals enrolled.  Id. § 18082(c)(2)(A).  The insurers are required to use these advance payments to reduce the premiums of the eligible individuals.  Id. § 18082(c)(2)(B)(i); see also 26 U.S.C. § 36B(f) (describing the process for annually reconciling an individual's actual premium tax credit with the advance payments of the credit).  To fund the premium tax credit, Congress amended a preexisting permanent appropriation to allow for the payment of refunds arising from the credit.  See 31 U.S.C. § 1324 (2012) ("Necessary amounts are appropriated . . . for refunding internal revenue collections as provided by law . . . .  Disbursements may be made from the appropriation made by this section only for . . . refunds due from credit provisions of [26 U.S.C. § 36B].").

---

[2]  For example, for a silver-level qualified health plan, insurers are required to provide coverage for 70% of the benefits offered under the plan.  42 U.S.C. § 18022(d)(1)(B).  Insurers offering qualified health plans on an exchange must offer at least one silver-level plan and one gold-level plan.  Id. § 18021(a)(1)(C)(ii).

### 2. Cost-Sharing Reductions

The other reform, cost-sharing reductions, is designed to reduce the out-of-pocket expenses (such as deductibles, copayments, and coinsurance[3]) paid by individuals whose household income is between 100% and 250% of the poverty line.  See 42 U.S.C. §§ 18022(c)(3), 18071(c)(2); accord 45 C.F.R. §§ 155.305(g), 156.410(a).  Insurers offering qualified health plans are required to reduce eligible individuals' cost-sharing obligations by specified amounts,[4] 42 U.S.C. § 18071(a), and the Secretary of HHS is required to reimburse the insurers for the cost-sharing reductions they make, see id. § 18071(c)(3)(A) ("[T]he Secretary [of HHS] shall make periodic and timely payments to the issuer equal to the value of the reductions.").

The Secretary of HHS is afforded some discretion in the timing of the reimbursements: once he determines which individuals are eligible for cost-sharing reductions, he must notify the Treasury Secretary "if an advance payment of the cost-sharing reductions . . . is to be made to the issuer of any qualified health plan" and, if so, the time and amount of such advance payment.  Id. § 18082(c)(3).  Pursuant to this authority, the Secretary of HHS established a reimbursement schedule by which the government "would make monthly advance payments to issuers to cover projected cost-sharing reduction amounts, and then reconcile those advance payments at the end of the benefit year to the actual cost-sharing reduction amounts."  Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. 15,410, 15,486 (Mar. 11, 2013) (to be codified at 45 C.F.R. § 156.430); see also 45 C.F.R. § 156.430(b)(1) ("A [qualified health plan] issuer will receive periodic advance payments [for cost sharing reductions].").  The amount of the cost-sharing reduction payments owed to insurers is based on information provided to HHS by the insurers.  See 45 C.F.R. § 156.430(c) (requiring insurers to report to HHS, "for each policy, the total allowed costs for essential health benefits charged for the policy for the benefit year, broken down by . . . (i) [t]he amount the [insurer] paid[,] (ii) [t]he amount the enrollee(s) paid[, and] (iii) [t]he amount the enrollee(s) would have paid under the standard plan without cost-sharing reductions").

The Affordable Care Act did not include any language appropriating funds to make the cost-sharing reduction payments.

---

[3] "The term 'cost-sharing' includes . . . deductibles, coinsurance, copayments, or similar charges," but not "premiums, balance billing amounts for non-network providers, or spending for non-covered services."  42 U.S.C. § 18022(c)(3).

[4] To be eligible for cost-sharing reductions, an individual must enroll in a silver-level qualified health plan.  42 U.S.C. § 18071(b)(1).  Under a standard silver-level plan, insurers are required to provide coverage for 70% of the benefits offered under the plan.  Id. § 18022(d)(1)(B).  However, for eligible individuals, that percentage increases to 73% (when household income is between 200% and 250% of the poverty line), 87% (when household income is between 150% and 200% of the poverty line), or 94% (when household income is between 100% and 150% of the poverty line).  Id. § 18071(c)(2).

### 3.  Requirements for Insurers

To offer a health insurance plan on an exchange in any given year—and become eligible to receive payments for the premium tax credit and cost-sharing reductions—an insurer must satisfy certain requirements established by the Secretary of HHS.  See, e.g., 42 U.S.C. § 18041(a)(1) (authorizing the Secretary of HHS to "issue regulations setting standards for meeting the requirements under [title I of the Affordable Care Act] with respect to—(A) the establishment and operation of Exchanges . . . ; (B) the offering of qualified health plans through such Exchanges; . . . and (D) such other requirements as the Secretary determines appropriate"). The requirements include (1) obtaining certification that any plan it intends to offer is a qualified health plan, see, e.g., 45 C.F.R. §§ 155.1000, .1010, 156.200; (2) submitting rate and benefit information before the open enrollment period for the applicable year, see, e.g., id. §§ 155.1020, 156.210; and (3) executing a standard Qualified Health Plan Issuer Agreement ("QHPI Agreement") with the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS,[5] for that year,[6] see id. § 155.260(b) (requiring exchanges to execute agreements with entities that will gain access to personally identifiable information submitted to the exchanges that address privacy and security standards and obligations); see also id. § 155.20 (defining "exchange" to include exchanges established and operated by either a state or HHS).

With respect to the latter requirement, each QHPI Agreement includes the following recitals:

WHEREAS:

1. Section 1301(a) of the Affordable Care Act . . . provides that [Qualified Health Plans] are health plans that are certified by an Exchange and, among other things, comply with the regulations developed by the Secretary of the

---

[5]  The Secretary of HHS delegated to the Administrator of CMS (1) his authority—granted in section 1301 of the Affordable Care Act—"pertaining to defining qualified health plans"; (2) his authority—granted in section 1311 of the Affordable Care Act—"pertaining to affordable choices of health benefit plans"; and (3) his authority—granted in section 1321 of the Affordable Care Act—"pertaining to the State's flexibility in operation and enforcement of [exchanges] and related requirements."  Delegation of Authorities, 76 Fed. Reg. 53,903, 53,903 (Aug. 30, 2011); see also 42 U.S.C. §§ 18021 (codifying section 1301 of the Affordable Care Act), 18031 (codifying section 1311 of the Affordable Care Act), 18041 (codifying section 1321 of the Affordable Care Act).

[6]  The QHPI Agreements for 2017 and 2018 include, as relevant in this case, identical language.  See Ctrs. for Medicare & Medicaid Servs., Dep't of Health & Human Servs., Plan Year 2017 QHP Issuer Agreement, https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/Plan-Year-2017-QHP-Issuer-Agreement.pdf (last visited Feb. 1, 2019); Ctrs. for Medicare & Medicaid Servs., Dep't of Health & Human Servs., Plan Year 2018 QHP Issuer Agreement, https://www.qhpcertification.cms.gov/s/PlanYear2018_ QHPIssuerAgreement_FFMSPM.pdf (last visited Feb. 1, 2019) (collectively, "Agreements").

Department of Health and Human Services under section 1321(a) and other requirements that an applicable Exchange may establish.

2. [Qualified Health Plan Issuer] is an entity licensed by an applicable State Department of Insurance . . . as an Issuer and seeks to offer through the [Federally-facilitated Exchange] in such State one or more plans that are certified to be [Qualified Health Plans].

3. It is anticipated that periodic [Advance Payments of the Premium Tax Credit], advance payments of [Cost-Sharing Reductions], and payments of [Federally-facilitated Exchange] user fees will be due between CMS and [Qualified Health Plan Issuer].

4. [Qualified Health Plan Issuer] and CMS are entering into this Agreement to memorialize the duties and obligations of the parties, including to satisfy the requirements under 45 CFR 155.260(b)(2).

Now, therefore, in consideration of the promises and covenants herein contained, the adequacy of which the Parties acknowledge, [Qualified Health Plan Issuer] and CMS agree as follows . . . .

Agreements 1. Section I of each agreement is titled "Definitions." Id. at 1-3. Section II of each agreement, titled "Acceptance of Standard Rules of Conduct," addresses standards related to personally identifiable information (as set forth in 45 C.F.R. § 155.260) and communications with CMS's Data Services Hub. Id. at 3-6. Section III of each agreement is titled "CMS Obligations" and provides, in its entirety:

a. CMS will undertake all reasonable efforts to implement systems and processes that will support [Qualified Health Plan Issuer] functions. In the event of a major failure of CMS systems and/or processes, CMS will work with [Qualified Health Plan Issuer] in good faith to mitigate any harm caused by such failure.

b. As part of a monthly payments and collections reconciliation process, CMS will recoup or net payments due to [Qualified Health Plan Issuer] against amounts owed to CMS by [Qualified Health Plan Issuer] in relation to offering of [Qualified Health Plans] or any entity operating under the same tax identification number as [Qualified Health Plan Issuer] (including overpayments previously made), including the following types of payments: [Advance Payments of the Premium Tax Credit], advance payments of [Cost-Sharing Reductions], and payment of Federally-facilitated Exchange user fees.

Id. at 6. The remaining sections of the agreements contain various boilerplate provisions, see id. at 6-9, including several related to the termination of the agreements, id. at 6-7. One termination-related clause provides:

[Qualified Health Plan Issuer] acknowledges that termination of this Agreement 1) may affect its ability to continue to offer [Qualified Health Plans] through the [Federally-facilitated Exchange]; 2) does not relieve [Qualified Health Plan Issuer] of applicable obligations to continue providing coverage to enrollees; and 3) specifically does not relieve [Qualified Health Plan Issuer] of any obligation under applicable State law to continue to offer coverage for a full plan year.

Id. at 7.  Each agreement is to be executed by authorized representatives of the insurer and CMS. Id. at 10-11 (2017 agreement), 9-10 (2018 agreement).

In addition, in most circumstances, insurers must make their qualified health plans available on the exchanges for the entire year for which the plans were certified.  45 C.F.R. § 156.272(a).

### B.  Termination of Cost-Sharing Reduction Payments

On April 10, 2013, before the exchanges opened for business, President Barack H. Obama submitted to Congress his budget for fiscal year 2014.  See Office of Mgmt. & Budget, Exec. Office of the President, Fiscal Year 2014 Budget of the United States Government to Congress (2013).  The budget included a request for a line-item appropriation for cost-sharing reduction payments.  See id. at App. 448; accord Ctrs. for Medicare & Medicaid Servs., Dep't of Health & Human Servs., Fiscal Year 2014 Justification of Estimates for Appropriations Committees 184 (2013).  However, Congress did not provide the requested appropriation.  See Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, 128 Stat. 5; see also S. Rep. No. 113-71, at 123 (2013) ("The Committee recommendation does not include a mandatory appropriation, requested by the administration, for reduced cost sharing assistance . . . as provided for in sections 1402 and 1412 of the [Affordable Care Act].").  In fact, it is undisputed by the parties that Congress has never specifically appropriated funds to reimburse insurers for their cost-sharing reductions.[7]  It is further undisputed that Congress has never (1) expressly prevented—in an appropriations act or otherwise—the Secretary of HHS or the Treasury Secretary from expending funds to make cost-sharing reduction payments or (2) amended the Affordable Care Act to eliminate the cost-sharing reduction payment obligation.

Although Congress did not specifically appropriate funds for cost-sharing reduction payments, the Obama administration began making advance payments to insurers for cost-sharing reductions in January 2014.  See Ctrs. for Medicare & Medicaid Servs., Dep't of Health & Human Servs., Guidance Related to Reconciliation of the Cost-Sharing Reduction Component of Advance Payments for Benefit Years 2014 and 2015 27 (2016).  It made the payments from "the same account from which the premium tax credit" advance payments were made—in other words, from the permanent appropriation described in 31 U.S.C. § 1324.  Letter from Sylvia M.

---

[7]  Whether Congress will appropriate funds for cost-sharing reduction payments in the future is an open question.  Cf. Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2020, 84 Fed. Reg. 227, 283 (Jan. 24, 2019) ("The Administration supports a legislative solution that would appropriate [cost-sharing reduction] payments . . . .").

Burwell, Director of the Office of Mgmt. & Budget, to Ted Cruz and Michael S. Lee, U.S. Senators 4 (May 21, 2014), http://www.cruz.senate.gov/files/documents/Letters/20140521_ Burwell_Response.pdf.

On November 21, 2014, the United States House of Representatives ("House") sued the Obama administration in the United States District Court for the District of Columbia ("D.C. district court") to stop the payment of cost-sharing reduction reimbursements to insurers. See generally U.S. House of Representatives v. Burwell, No. 1:14-cv-01967-RMC (D.D.C. filed Nov. 21, 2014). The D.C. district court ruled for the House, holding:

> The Affordable Care Act unambiguously appropriates money for Section 1401 premium tax credits but not for Section 1402 reimbursements to insurers. Such an appropriation cannot be inferred. None of Secretaries' extra-textual arguments— whether based on economics, "unintended" results, or legislative history—is persuasive. The Court will enter judgment in favor of the House of Representatives and enjoin the use of unappropriated monies to fund reimbursements due to insurers under Section 1402. The Court will stay its injunction, however, pending appeal by either or both parties.

U.S. House of Representatives v. Burwell, 185 F. Supp. 3d 165, 168 (D.D.C. 2016). The Obama administration appealed the ruling. See generally U.S. House of Representatives v. Azar ("Azar"), No. 16-5202 (D.C. Cir. filed July 6, 2016). However, the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") stayed the appeal to allow President-elect Donald J. Trump and his future administration time to determine how to proceed. See Mot. Hold Briefing Abeyance 1-2, Azar, No. 16-5202 (Nov. 21, 2016); Order, Azar, No. 16-5202 (Nov. 21, 2016).

The Trump administration continued the previous administration's practice of making advance cost-sharing reduction payments to insurers. However, on October 11, 2017, the United States Attorney General sent a letter to the Treasury Secretary and the Acting Secretary of HHS advising that "the best interpretation of the law is that the permanent appropriation for 'refunding internal revenue collections,' 31 U.S.C. § 1324, cannot be used to fund the [cost-sharing reduction] payments to insurers authorized by 42 U.S.C. § 18071." Letter from Jefferson B. Sessions III, U.S. Attorney General, to Steven Mnuchin, Sec'y of the Treasury, and Don Wright, M.D., M.P.H., Acting Sec'y of HHS 1 (Oct. 11, 2017), http://www.hhs.gov/sites/default/files/ csr-payment-memo.pdf. Based on this guidance, the Acting Secretary of HHS directed, the following day, that "[cost-sharing reduction] payments to issuers must stop, effective immediately," and that such "payments are prohibited unless and until a valid appropriation exists." Memorandum from Eric Hargan, Acting Sec'y of HHS,[8] to Seema Verma,

---

[8] Eric Hargan was named Acting Secretary of HHS on October 10, 2017. See Press Release, The White House, President Donald J. Trump Announces Intent to Nominate Personnel to Key Administration Posts (Oct. 10, 2017), https://www.whitehouse.gov/presidential-actions/president-donald-j-trump-announces-intent-nominate-personnel-key-administration-posts-22/.

Administrator of the Ctrs. for Medicare & Medicaid Servs. (Oct. 12, 2017), http://www.hhs.gov/
sites/default/files/csr-payment-memo.pdf.

### C. Reaction to the Termination of Cost-Sharing Reduction Payments

The Trump administration's termination of cost-sharing reduction payments did not come
as a surprise to insurers:

> Anticipating that the Administration would terminate [cost-sharing reduction]
> payments, most states began working with the insurance companies to develop a
> plan for how to respond.  Because the Affordable Care Act requires insurance
> companies to offer plans with cost-sharing reductions to customers, the federal
> government's failure to meet its [cost-sharing reduction] payment obligations
> meant the insurance companies would be losing that money.  So most of the states
> set out to find ways for the insurance companies to increase premiums for 2018
> (with open enrollment beginning in November 2017) in a fashion that would
> avoid harm to consumers.  And the states came up with an idea:  allow the
> insurers to make up the deficiency through premium increases for silver plans
> only.  In other words, allow a relatively large premium increase for silver plans,
> but no increase for bronze, gold, or platinum plans.

> As a result, in these states, for everyone between 100% and 400% of the
> federal poverty level who wishes to purchase insurance on the exchanges, the
> available tax credits rise substantially.  Not just for people who purchase the silver
> plans, but for people who purchase other plans too.

California, 267 F. Supp. 3d at 1134-35 (footnote omitted).  In other words, by raising premiums
for silver-level qualified health plans, the insurers would obtain more money from the premium
tax credit program, which would help mitigate the loss of the cost-sharing reduction payments.[9]
Accord id. at 1139 (agreeing with the states "that the widespread increase in silver plan
premiums will qualify many people for higher tax credits, and that the increased federal
expenditure for tax credits will be far more significant than the decreased federal expenditure for
[cost-sharing reduction] payments").  This approach is commonly referred to as "silver loading,"
and many states appear to have endorsed it, see id. at 1137 ("Even before the Administration
announced its decision, 38 states accounted for the possible termination of [cost-sharing

---

[9]  Notably, increasing silver-level qualified health plan premiums would not harm most
consumers who qualify for the premium tax credit because the credit increases as the premium
increases.  See California, 267 F. Supp. 3d at 1134 ("[T]he amount [of the premium tax credit] is
based on the cost of the second-cheapest silver plan available on the exchange in your
geographic area, and then adjusted based on your income (that is, based on where you fall on the
spectrum between 100% and 400% of the federal poverty level).  So, if premiums for the second-
cheapest silver plan in your area go up, the amount of your tax credit will go up by a
corresponding amount.  See 26 U.S.C. § 36B."); see also id. at 1122 ("[M]ost state regulators
have devised responses that give millions of lower-income people better health coverage options
than they would otherwise have had.").

reduction] payments in setting their 2018 premium rates.  And now that the announcement has been made, even more states are adopting [the] strategy [of increasing silver-level plan premiums to obtain additional premium tax credit payments]." (footnote omitted)).

### D.  Other Litigation

While the states and insurers were working on ways to mitigate the loss of cost-sharing reduction payments, the parties in the case on appeal at the D.C. Circuit began discussing that case's disposition.  Joint Status Report 1-2, Azar, No. 16-5202 (Nov. 30, 2017).  Ultimately, at the request of the parties, the D.C. Circuit dismissed the appeal, Order, Azar, No. 16-5202 (May 16, 2018), and the D.C. district court vacated the portion of its ruling in which it provided that "reimbursements paid to issuers of qualified health plans for the cost-sharing reductions mandated by Section 1402 of the Affordable Care Act, Pub. L. 111-148, are ENJOINED pending an appropriation for such payments," Order, Azar, No. 1:14-cv-01967-RMC (May 18, 2018).

A separate lawsuit was filed by seventeen states and the District of Columbia in the United States District Court for the Northern District of California ("California district court") to compel the Trump administration to continue making the advance cost-sharing reduction payments to insurers.  See generally California v. Trump, No. 3:17-cv-05895-VC (N.D. Cal. filed Oct. 13, 2017).  The California district court denied the states' motion for a preliminary injunction.  California, 267 F. Supp. 3d at 1121-22, 1140.  Eventually, the states requested a stay of the proceedings or, alternatively, dismissal of the suit without prejudice, explaining:

> [S]taying the proceedings is warranted to avoid disturbing the status quo given the general success of the practice commonly referred to as "silver-loading" which mostly curbed the harm caused by the federal government's unjustified cessation of cost-sharing reduction (CSR) subsidies mandated by Section 1402 of the Patient Protection and Affordable Care Act (ACA).  At the same time, because of the real threat of the federal government taking action to prohibit silver-loading, the Court should retain jurisdiction, thus allowing the Plaintiff States to expeditiously seek appropriate remedies from this Court for the protection of their citizens.  Alternatively, if the Court determines that a stay is not appropriate at this time, the Plaintiff States respectfully request that the Court dismiss the action without prejudice.

Mot. for Order Staying Proceedings or, in the Alternative, Dismissing Action Without Prejudice 2, California, No. 3:17-cv-05895-VC (July 16, 2018); cf. HHS Notice of Benefit and Payment Parameters for 2020, 84 Fed. Reg. at 283 ("The Administration supports a legislative solution that would appropriate CSR payments and end silver loading.  In the absence of Congressional action, we seek comment on ways in which HHS might address silver loading, for potential action in future rulemaking applicable not sooner than plan year 2021.").  The California district court dismissed the case without prejudice on July 18, 2018.  Order Dismissing Case Without Prejudice, California, No. 3:17-cv-05895-VC (July 18, 2018).

**E.  Effect of Cost-Sharing Reduction Payment Termination on Plaintiff**

Plaintiff is a nonprofit corporation, organized as a Consumer Operated and Oriented Plan under section 1332 of the Affordable Care Act, that offers qualified health plans on Maine's exchange.[10]  It began offering qualified health plans on the exchange in 2014, and continued to offer such plans in 2015, 2016, 2017, and 2018.  As of the end of 2017, plaintiff had the largest number of exchange-insured individuals in Maine.  Plaintiff began receiving monthly advance cost-sharing reduction payments in January 2014 and, as with every other insurer offering qualified health plans on the exchanges, stopped receiving these payments effective October 12, 2017.  Had the government not ceased these payments, plaintiff avers that it would have received another $5,651,672.49 in 2017.  Plaintiff asserts that this deficiency has caused it to suffer large financial losses.

**F.  Procedural History**

Plaintiff filed a complaint in this court on December 28, 2017, to recover the cost-sharing reduction payments that the government has not made for 2017.[11]  It asserts two claims for relief, contending that in failing to make the cost-sharing reduction payments to insurers, the government violated the statutory and regulatory mandate and breached an implied-in-fact contract.  Plaintiff moves for summary judgment and defendant cross-moves to dismiss the complaint.  The parties completed briefing, and after hearing argument on February 14, 2019, the court is prepared to rule.[12]

---

[10]  It appears that the facts in this subsection, which are derived from the allegations in plaintiff's complaint, are undisputed.  However, plaintiff has not submitted any documentation in support of its claimed amount of unpaid cost-sharing reduction reimbursements.

[11]  A number of other insurers have filed suit in this court seeking to recover unpaid cost-sharing reduction reimbursements.  See, e.g., Common Ground Healthcare Coop. v. United States, No. 17-877C (Chief Judge Sweeney); Local Initiative Health Auth. for L.A. Cty. v. United States, No. 17-1542C (Judge Wheeler); Cmty. Health Choice, Inc. v. United States, No. 18-5C (Chief Judge Sweeney); Sanford Health Plan v. United States, No. 18-136C (Judge Kaplan); Montana Health Co-op v. United States, No. 18-143C (Judge Kaplan); Molina Healthcare of Cal., Inc. v. United States, No. 18-333C (Judge Wheeler); Health Alliance Med. Plans, Inc. v. United States, No. 18-334C (Judge Campbell-Smith); Blue Cross & Blue Shield of Vt. v. United States, No. 18-373C (Judge Horn); Guidewell Mut. Holding Corp. v. United States, No. 18-1791C (Judge Griggsby); Harvard Pilgrim Health Care, Inc. v. United States, No. 18-1820C (Judge Smith).

[12]  The court has had the benefit of full briefing and oral argument in three cost-sharing reduction cases:  Common Ground Healthcare Cooperative v. United States, No. 17-877C, Maine Community Health Options v. United States, No. 17-2057C, and Community Health Choice, Inc. v. United States, No. 18-5C.  The plaintiffs in all three cases allege that the government violated the cost-sharing reduction statutes and regulations, and the plaintiffs in two of the cases allege a breach of an implied-in-fact contract.  Thus, in ruling on the parties'

## II.  STANDARDS OF REVIEW

### A.  Motions for Summary Judgment

Plaintiff moves for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC").  Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. RCFC 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is genuine if it "may reasonably be resolved in favor of either party."  Id. at 250.  Entry of summary judgment is mandated against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.  Statutory construction and contract interpretation "are questions of law amenable to resolution through summary judgment."  Stathis v. United States, 120 Fed. Cl. 552, 561 (2015); accord Varilease Tech. Group, Inc. v. United States, 289 F.3d 795, 798 (Fed. Cir. 2002) ("Contract interpretation is a question of law generally amenable to summary judgment."); Anderson v. United States, 54 Fed. Cl. 620, 629 (2002) ("The plaintiff's entitlement . . . rests solely upon interpretation of the cited statute and is thus amenable to resolution by summary judgment."), aff'd, 70 F. App'x 572 (Fed. Cir. 2003) (unpublished opinion).

### B.  Motions to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted

Defendant cross-moves to dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6).  To survive such a motion, a plaintiff must include in its complaint "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In other words, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp., 550 U.S. at 556).  Indeed, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-19 (1982).

## III.  DISCUSSION

As noted above, in seeking to recover the cost-sharing reduction payments not made by the government, plaintiff asserts two claims for relief.  The court addresses each in turn.

---

motions in this case, the court has, when applicable, considered the parties' arguments in all three cases.

**A.  Violation of Statute**

Plaintiff first contends that the government's failure to make the payments was a violation of the cost-sharing reduction provisions of the Affordable Care Act and its implementing regulations.  Plaintiff further contends that Congress's failure to specifically appropriate funds for cost-sharing reduction payments does not suspend or terminate the government's obligation to make the payments.  Defendant disagrees, arguing that Congress expressed its intent that cost-sharing reduction payments should not be made absent a specific appropriation for that purpose by not appropriating funds for cost-sharing reductions in the Affordable Care Act or thereafter.  Consequently, defendant contends, monetary damages—payable from the Judgment Fund—are unavailable from this court.

**1.  The Government Is Obligated to Make Cost-Sharing Reduction Payments to Plaintiff Notwithstanding the Absence of a Specific Appropriation for That Purpose**

To determine whether Congress intended the government to make cost-sharing reduction payments to insurers, the court first turns to the language of the Affordable Care Act.  See Lamie v. U.S. Tr., 540 U.S. 526, 534 (2004) ("The starting point in discerning congressional intent is the existing statutory text."); see also Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.").  In addition to evaluating the specific provision of the Affordable Care Act establishing the cost-sharing reduction program, the court must read that provision in the context of the Affordable Care Act as a whole.  See King v. St. Vincent's Hosp., 502 U.S. 215, 221 (1991) (following "the cardinal rule that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context" (citation omitted)); Crandon v. United States, 494 U.S. 152, 158 (1990) ("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy."); Kokoszka v. Belford, 417 U.S. 642, 650 (1974) ("When 'interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute (or statutes on the same subject) and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the Legislature . . . .'" (quoting Brown v. Duchesne, 60 U.S. 183, 194 (1856))); see also Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843 n.9 (1984) ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."); Kilpatrick v. Principi, 327 F.3d 1375, 1384 (Fed. Cir. 2003) ("[I]n determining whether Congress has directly spoken to the point at issue, a court should attempt to discern congressional intent either from the plain language of the statute or, if necessary, by resort to the applicable tools of statutory construction[.]").  If congressional intent regarding the obligation to make cost-sharing reduction payments can be ascertained from evaluating the text of the Affordable Care Act, then the court's inquiry on this issue is complete.  See Conn. Nat'l Bank, 503 U.S. at 254.

The statutory provision governing cost-sharing reductions sets forth an unambiguous mandate:  "the Secretary [of HHS] shall make periodic and timely payments" to insurers "equal to the value of the reductions" made by the insurers.  42 U.S.C. § 18071(c)(3)(A); accord

<u>Montana Health Co-op v. United States</u>, 139 Fed. Cl. 213, 218 (2018)[13] ("[T]he statutory language clearly and unambiguously imposes an obligation on the Secretary of HHS to make payments to health insurers that have implemented cost-sharing reductions on their covered plans as required by the [Affordable Care Act]."); <u>see also</u> <u>SAS Inst., Inc. v. Iancu</u>, 138 S. Ct. 1348, 1354 (2018) ("The word 'shall' generally imposes a nondiscretionary duty."); <u>Gilda Indus., Inc. v. United States</u>, 622 F.3d 1358, 1364 (Fed. Cir. 2010) ("When a statute directs that a certain consequence 'shall' follow from specified contingencies, the provision is mandatory and leaves no room for discretion."); <u>cf.</u> <u>Moda Health Plan, Inc. v. United States</u>, 892 F.3d 1311, 1320 (2018) (concluding that similar language in section 1342 of the Affordable Care Act—indicating that the Secretary of HHS "shall establish" a risk corridors program pursuant to which the Secretary of HHS "shall pay" risk corridors payments—is "unambiguously mandatory"). Moreover, the mandatory payment obligation fits logically within the statutory scheme established by Congress.  The cost-sharing reduction payments were meant to reimburse insurers for paying an increased share of their insureds' cost-sharing obligations, 42 U.S.C. § 18071(a)(2), (c)(3)(A), and the reduction of insureds' cost-sharing obligations was meant to make obtaining health care more affordable, <u>see, e.g.</u>, <u>id.</u> § 18071(c)(1)(A) (describing how cost-sharing reductions would be achieved by reducing insureds' out-of-pocket limits).  In short, the plain language, structure, and purpose of the Affordable Care Act reflect the intent of Congress to require the Secretary of HHS to make cost-sharing reduction payments to insurers.

Defendant does not dispute this conclusion.  Rather, it contends that the cost-sharing reduction payment obligation is unenforceable because Congress never specifically appropriated funds—either in the Affordable Care Act or thereafter—to make cost-sharing reduction payments.

### a.  The Lack of Specific Appropriating Language in the Affordable Care Act

As defendant observes, the Affordable Care Act does not include any language specifically appropriating funds for cost-sharing reduction payments.  Defendant also correctly observes that the Act's cost-sharing reduction provision lacks any appropriating language, while its companion provision—the premium tax credit—included an explicit funding mechanism.[14] <u>Compare</u> Affordable Care Act § 1401(d) (amending the permanent appropriation set forth in 31 U.S.C. § 1324 to allow for the payment of the premium tax credit), <u>with</u> <u>id.</u> § 1402 (containing no appropriating language).  According to defendant, the absence of any funding mechanism for cost-sharing reduction payments, and Congress's decision to provide a funding mechanism for premium tax credit payments and not cost-sharing reduction payments, reflect the intent of Congress, when enacting the Affordable Care Act, to preclude liability for cost-sharing reduction payments.  Defendant is mistaken for several reasons.

---

[13]  The judge who decided <u>Montana Health Co-op</u>—the Honorable Elaine D. Kaplan—subsequently issued a substantively identical ruling in another case.  See <u>Samford Health Plan v. United States</u>, 139 Fed. Cl. 701 (2018).

[14]  Both provisions appear in subpart A of part I of subtitle E of the Affordable Care Act, which is titled "Premium Tax Credits and Cost-Sharing Reductions."  124 Stat. at 213-24.

First, it is well settled that the government can create a liability without providing for the means to pay for it.  See, e.g., Moda Health Plan, 892 F.3d at 1321 ("[I]t has long been the law that the government may incur a debt independent of an appropriation to satisfy that debt, at least in certain circumstances."); Collins v. United States, 15 Ct. Cl. 22, 35 (1879) ("[T]he legal liabilities incurred by the United States under . . . the laws of Congress . . . may be created where there is no appropriation of money to meet them . . . .").  Thus, the absence of a specific appropriation for cost-sharing reduction payments in the Affordable Care Act does not, on its own, extinguish the government's obligation to make the payments.

Second, that Congress provided a funding mechanism for premium tax credit payments and not for cost-sharing reduction payments does not reflect congressional intent to foreclose liability for the latter.  Defendant relies on the proposition that when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  Russello v. United States, 464 U.S. 16, 23 (1983) (quoting United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir. 1972)); accord Digital Realty Trust, Inc. v. Somers, 138 S. Ct. 767, 777 (2018).  Here, although Congress may have acted intentionally by treating the two related provisions differently,[15] it is difficult to discern what that intent might be.  In addition to the intent inferred by defendant, there are other reasonable explanations for the disparity.  One possible explanation is that it was a simple matter to add the premium tax credit to a preexisting permanent appropriation in the Internal Revenue Code for the payment of tax credits, whereas no such permanent appropriation existed that would apply to cost-sharing reduction payments.  Another possible explanation is that Congress understood that other funds available to HHS could be used to make the cost-sharing reduction payments; indeed, the cost-sharing reduction provision lacks any language, such as "subject to the availability of appropriations," reflecting Congress's recognition that appropriations were unavailable, see Greenlee Cty., Ariz. v. United States, 487 F.3d 871, 878 (Fed. Cir. 2007) (observing that "in some instances the statute creating the right to compensation . . . may restrict the government's liability . . . to the amount appropriated by Congress" with language such as "subject to the availability of appropriations").  A third possible explanation is that Congress intended to defer appropriating funds for cost-sharing reduction payments until 2014, when insurers began to offer qualified health plans on the exchanges and incur cost-sharing reduction liabilities.  Because it is unclear which of these explanations—if any—is correct, the court declines to ascribe any particular intent to Congress based on Congress's disparate treatment of the two provisions.

Third, the court is unpersuaded by defendant's related contention that insurers' ability to increase premiums for their silver-level qualified health plans to obtain greater premium tax credit payments, and thus offset any losses from the government's nonpayment of cost-sharing reduction reimbursements, is evidence that Congress did not intend to provide a statutory damages remedy for the government's failure to make the cost-sharing reduction payments.

---

[15]  Alternatively, it is possible that the disparate treatment does not reflect any intent at all.  As the United States Supreme Court ("Supreme Court") recognized in King, "[t]he Affordable Care Act contains more than a few examples of inartful drafting." 135 S. Ct. at 2492.  Thus, Congress's failure to include any appropriating language in the cost-sharing reduction provision may simply have been an oversight.

Accord <u>Montana Health Co-op</u>, 139 Fed. Cl. at 221.  Defendant does not identify any statutory provision permitting the government to use premium tax credit payments to offset its cost-sharing reduction payment obligation (even if insurers intentionally increased premiums to obtain larger premium tax credit payments to make up for lost cost-sharing reduction payments). Nor does defendant identify any evidence in the Affordable Care Act's legislative history suggesting that Congress intended to limit its liability to make cost-sharing reduction payments by increasing its premium tax credit payments.  That insurers and states discovered a way to mitigate the insurers' losses from the government's failure to make cost-sharing reduction payments does not mean that Congress intended this result.  Moreover, defendant's concern that Congress could not have intended to allow a double recovery of cost-sharing reduction payments is not well taken.  The increased amount of premium tax credit payments that insurers receive from increasing silver-level plan premiums are still premium tax credit payments, not cost-sharing reduction payments.  Indeed, under the statutory scheme as it exists, even if the government were making the required cost-sharing reduction payments, insurers could (to the extent permitted by their state insurance regulators) increase their silver-level plan premiums; in such circumstances, it could not credibly be argued that the insurers were obtaining a double recovery of cost-sharing reduction payments.  While the premium tax credit and cost-sharing reduction provisions were enacted to reduce an individual's health-care-related costs (to obtain insurance and to obtain health care, respectively), they are not substitutes for each other.[16]

Fourth, it would defy common sense to conclude that Congress obligated the Secretary of HHS to reimburse insurers for their mandatory cost-sharing reductions without intending to actually reimburse the insurers.  If Congress did not intend to create such an obligation, it would not have included any provision for reimbursing cost-sharing reductions in the Act.

In sum, Congress's failure to include any appropriating language in the Affordable Care Act does not reflect congressional intent to preclude liability for cost-sharing reduction payments.  This conclusion, however, does not end the court's analysis because defendant also argues that Congress's subsequent failure to appropriate funds to make cost-sharing reduction payments through annual appropriations acts or otherwise signals congressional intent to foreclose liability.

---

[16]  The California district court's decision in <u>California v. Trump</u> does not assist defendant.  Although the court described how insurers are coping with the lost cost-sharing reduction payments by raising silver-level qualified health plan premiums to obtain larger premium tax credit payments, nowhere in its decision does the court hold that the government's liability for cost-sharing reduction payments is lessened or eliminated by the government making larger premium tax credit payments to insurers.  Indeed, the court very clearly emphasized that the premium tax credit program and the cost-sharing reduction program were separate and distinct.  <u>See</u> <u>California</u>, 267 F. Supp. 3d at 1131.  Moreover, the court's discussion of the approach taken by insurers to obtain increased premium tax credit payments was included within its analysis of "whether the absence of a preliminary injunction would harm the public and impede the objectives of health care reform."  <u>Id.</u> at 1133.  In other words, the court's focus was on how the increase in premiums would affect the public, and not on the government's obligation to make payments to insurers.

**b. The Lack of Specific Appropriating Language in Subsequent Appropriations Acts**

The Appropriations Clause of the United States Constitution provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law[.]" U.S. Const. art. I, § 9, cl. 7. The statute commonly referred to as the Antideficiency Act further provides that "[a]n officer or employee of the United States Government . . . may not . . . make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation[.]" 31 U.S.C. § 1341(a)(1)(A). These directives are unambiguous: disbursements from the United States Treasury require an appropriation from Congress. However, "the mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a Government obligation created by statute." N.Y. Airways, Inc. v. United States, 369 F.2d 743, 748 (Ct. Cl. 1966) (per curiam), cited in Moda Health Plan, 892 F.3d at 1321-22; cf. Moda Health Plan, 892 F.3d at 1322 (recognizing that the Supreme Court "rejected the notion that the Anti-Deficiency Act's requirements somehow defeat the obligations of the government").

Defendant does not contend that any appropriations acts—or, indeed, any statutes at all— enacted after the Affordable Care Act contain language that "expressly or by clear implication" modifies or repeals the Act's cost-sharing reduction payment obligation. Rather, it relies on Congress's complete failure to appropriate funds for cost-sharing reduction payments as evidence that Congress intended to suspend the cost-sharing reduction payment obligation. Defendant's reliance is misplaced. None of the appropriations acts enacted after the Affordable Care Act expressly or impliedly disavowed the payment obligation; they were completely silent on the issue. Thus, this case is distinguishable from those relied upon by defendant—Mitchell v. United States, 109 U.S. 146 (1883), Dickerson v. United States, 310 U.S. 554 (1940), and United States v. Will, 449 U.S. 200 (1980)—that concerned situations in which Congress made affirmative statements in appropriations acts that reflected an intent to suspend the underlying substantive law.

Here, Congress has had ample opportunity to modify, suspend, or eliminate the statutory obligation to make cost-sharing reduction payments but has not done so. Congress's inaction stands in stark contrast to its treatment of the Affordable Care Act's risk corridors program. Under that program, which was established in section 1342 of the Affordable Care Act, the Secretary of HHS was required to make annual payments to insurers pursuant to a statutory formula. 42 U.S.C. § 18062; Moda Health Plan, 892 F.3d at 1320. However, Congress included riders in two appropriations acts enacted after the Affordable Care Act that prohibited appropriated funds from being used to make risk corridors payments. See Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. H, tit. II, § 225, 129 Stat. 2242, 2624; Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, div. G, tit. II, § 227, 128 Stat. 2130, 2491. These riders have been interpreted to suspend the government's obligation to make risk corridors payments from appropriated funds. Moda Health Plan, 892 F.3d at 1322-29. Congress has never enacted any such appropriations riders with respect to cost-sharing reductions payments, even when cost-sharing reduction payments were being made— during both the Obama and Trump administrations—from the permanent appropriation for tax credits described in 31 U.S.C. § 1324. Thus, the congressional inaction in this case may be

interpreted, contrary to defendant's contention, as a decision not to suspend or terminate the government's cost-sharing reduction payment obligation.[17]

In short, Congress's failure to appropriate funds to make cost-sharing reduction payments through annual appropriations acts or otherwise does not reflect a congressional intent to foreclose, either temporarily or permanently, the government's liability to make those payments.

## 2. Plaintiff Can Recover Unpaid Cost-Sharing Reduction Reimbursements in the United States Court of Federal Claims

Plaintiff asserts that because the government has breached its statutory obligation to make cost-sharing reduction payments, recovery is available in the United States Court of Federal Claims ("Court of Federal Claims") under the Tucker Act. The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States, not sounding in tort, that are founded upon the United States Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1) (2012). It is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." United States v. Testan, 424 U.S. 392, 398 (1976). Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc). It is well accepted that a statute "is money-mandating for jurisdictional purposes if it 'can fairly be interpreted as mandating compensation for damages sustained as a result of the breach of the duties [it] impose[s].'" Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (panel portion) (quoting United States v. Mitchell, 463 U.S. 206, 219 (1983)). Under this rule, "[i]t is enough . . . that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages. While the premise to a Tucker Act claim will not be 'lightly inferred,' a fair inference will do." United States v. White Mountain Apache Tribe, 537 U.S. 465, 473 (2003) (citation omitted).

The cost-sharing reduction provision of the Affordable Care Act, codified at 42 U.S.C. § 18071, is a money-mandating statute for Tucker Act purposes: the Secretary of HHS is required to reimburse insurers for their mandatory cost-sharing reductions, 42 U.S.C. § 18071(c)(3)(A), and his failure to make such payments is a violation of that duty that deprives the insurers of money to which they are statutorily entitled. Accord Montana Health Co-op, 139 Fed. Cl. at 217; see also Moda Health Plan, 892 F.3d at 1320 n.2 (holding that the statute providing for risk corridors payments "is money-mandating for jurisdictional purposes").

---

[17] The court recognizes that drawing inferences from congressional inaction can be highly problematic. See Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 650 (1990) ("Congressional inaction lacks 'persuasive significance' because 'several equally tenable inferences' may be drawn from such inaction . . . ." (quoting United States v. Wise, 370 U.S. 405, 411 (1962)); Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 306 (1988) ("This Court generally is reluctant to draw inferences from Congress' failure to act.").

Consequently, an insurer that establishes that the government failed to make the cost-sharing reduction payments to which the insurer was entitled can recover the amount due in this court.[18]

Moreover, the lack of a specific appropriation for cost-sharing reduction payments does not preclude such a recovery.  Appropriations merely constrain government officials' ability to obligate or disburse funds.  See Moda Health Plan, 892 F.3d at 1322 ("The Anti-Deficiency Act simply constrains government officials. . . .  Budget authority is not necessary to create an obligation of the government; it is a means by which an officer is afforded that authority."); Ferris v. United States, 27 Ct. Cl. 542, 546 (1892) ("An appropriation per se merely imposes limitations upon the Government's own agents; it is a definite amount of money intrusted to them for distribution; but its insufficiency does not pay the Government's debts, nor cancel its obligations, nor defeat the rights of other parties.").  Thus, the lack of an appropriation, standing alone, does not constrain the court's ability to entertain a claim that the government has not discharged the underlying statutory obligation or to enter judgment for the plaintiff on that claim.  See Slattery v. United States, 635 F.3d 1298, 1321 (Fed. Cir. 2011) (en banc) ("[T]he jurisdictional foundation of the Tucker Act is not limited by the appropriation status of the agency's funds or the source of funds by which any judgment may be paid."); N.Y. Airways, 369 F.2d at 752 ("[T]he failure of Congress or an agency to appropriate or make available sufficient funds does not repudiate the obligation; it merely bars the accounting agents of the Government from disbursing funds and forces the carrier to a recovery in the Court of Claims."); Collins, 15 Ct. Cl. at 35 (remarking that a legal liability "incurred by the United States under . . . the laws of Congress," such as "[t]he compensation to which public officers are legally entitled . . . , exists independently of the appropriation, and may be enforced by proceedings in this court").

---

[18]  Defendant appears to contend that for plaintiffs to recover under a money-mandating statute, they must separately establish that the statute authorizes a damages remedy for its violation.  Defendant is incorrect.  Although some money-mandating statutes include a separate provision authorizing a damages remedy, see, e.g., 41 U.S.C. § 7104(b) (2012) (allowing contractors to bring claims arising under the Contract Disputes Act of 1978 in the Court of Federal Claims), other money-mandating statutes pursuant to which the Court of Federal Claims can enter judgment do not, see, e.g., 5 U.S.C. § 5942 (2012) (governing federal employees' entitlement to a remote duty allowance); 37 U.S.C. § 204 (2012) (governing military service members' entitlement to basic pay).  Indeed, "[t]o the extent that the Government would demand an explicit provision for money damages to support every claim that might be brought under the Tucker Act, it would substitute a plain and explicit statement standard for the less demanding requirement of fair inference that the law was meant to provide a damages remedy for breach of a duty."  White Mountain Apache Tribe, 537 U.S. at 477; accord Fisher, 402 F.3d at 1173 (en banc portion) ("[T]he determination that the source is money-mandating shall be determinative both as to the question of the court's jurisdiction and thereafter as to the question of whether, on the merits, plaintiff has a money-mandating source on which to base his cause of action."); Montana Health Co-op, 139 Fed. Cl. at 217 n.5 ("Plaintiffs have never been required to make some separate showing that the money-mandating statute that establishes this court's jurisdiction over their monetary claims also grants them an express (or implied) cause of action for damages.").

In fact, judgments of this court are payable from the Judgment Fund, see 31 U.S.C. § 1304(a)(3)(A), which "is a permanent, indefinite appropriation . . . available to pay many judicially and administratively ordered monetary awards against the United States," 31 C.F.R. § 256.1 (2016); accord Bath Iron Works Corp. v. United States, 20 F.3d 1567, 1583 (Fed. Cir. 1994) (stating that 31 U.S.C. § 1304 "was intended to establish a central, government-wide judgment fund from which judicial tribunals administering or ordering judgments, awards, or settlements may order payments without being constrained by concerns of whether adequate funds existed at the agency level to satisfy the judgment"). Indeed, as applicable here, "funds may be paid out [of the Judgment Fund] only on the basis of a judgment based on a substantive right to compensation based on the express terms of a specific statute." Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 432 (1990); accord Moda Health Plan, 892 F.3d at 1326 ("[A]ccess to the Judgment Fund presupposes liability."); cf. 31 U.S.C. § 1304(a)(1) (indicating that the Judgment Fund is available when "payment is not otherwise provided for"). Because plaintiff's claim arises from a statute mandating the payment of money damages in the event of its violation, the Judgment Fund is available to pay a judgment entered by the court on that claim.[19]

### 3. Plaintiff Is Entitled to Recover Unpaid Cost-Sharing Reduction Reimbursements

Plaintiff seeks to recover the cost-sharing reduction payments it did not receive for 2017. As noted above, plaintiff has established that the government is obligated to reimburse it for its cost-sharing reductions pursuant to 42 U.S.C. § 18071(c)(3)(A) and that the government stopped

---

[19] Defendant acknowledged this possibility in other litigation. See Defs.' Mem. Supp. Mot. Summ. J. 20, Burwell, 185 F. Supp. 3d at 165 (No. 1:14-cv-01967-RMC) ("The [Affordable Care] Act requires the government to pay cost-sharing reductions to issuers. The absence of an appropriation would not prevent the insurers from seeking to enforce that statutory right through litigation. Under the Tucker Act, a plaintiff may bring suit against the United States in the Court of Federal Claims to obtain monetary payments based on statutes that impose certain types of payment obligations on the government. If the plaintiff is successful, it can receive the amount to which it is entitled from the permanent appropriation Congress has made in the Judgment Fund. The mere absence of a more specific appropriation is not necessarily a defense to recovery from that Fund." (citations omitted)); Defs.' Mem. Opp'n Pl.'s Mot. Summ. J. 12-13, Burwell, 185 F. Supp. 3d at 165 (No. 1:14-cv-01967-RMC) ("Indeed, had Congress not permanently funded the cost-sharing reductions, it would have exposed the government to litigation by insurers, who could bring damages actions under the Tucker Act premised on the government's failure to make the mandatory cost-sharing reduction payments that the Act requires."); Defs.' Reply Mem. Supp. Mot. Summ. J. 9, Burwell, 185 F. Supp. 3d at 165 (No. 1:14-cv-01967-RMC) ("[T]he House's interpretation of the [Affordable Care Act]—under which the Act would require the government to make the cost-sharing payments but provide no appropriation for doing so directly—would invite potentially costly lawsuits under the Tucker Act. The House asserts that insurers could not prevail in such suits '[a]bsent a valid appropriation.' But courts have held that the absence of an appropriation does not necessarily preclude recovery from the Judgment Fund in a Tucker Act suit. The House does not explain how, given this precedent, the government could avoid Tucker Act litigation by insurers in the wake of a ruling that the ACA did not permanently fund the cost-sharing reduction payments that the Act directs the government to make." (citations omitted)).

making such reimbursements in October 2017.  Accordingly, it is entitled to recover the cost-sharing reduction payments that the government did not make for 2017.

## B.  Breach of an Implied-in-Fact Contract

In addition to alleging that the government violated its statutory obligation to make cost-sharing reduction payments, plaintiff contends that the government's failure to make such payments amounts to a breach of an implied-in-fact contract.  "An agreement implied in fact is 'founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'"  Hercules, Inc. v. United States, 516 U.S. 417, 424 (1996) (quoting Balt. & Ohio R. Co. v. United States, 261 U.S. 592, 597 (1923)).  To establish the existence of an implied-in-fact contract with the United States, a plaintiff must demonstrate "(1) mutuality of intent to contract, (2) consideration, (3) lack of ambiguity in offer and acceptance, and (4) authority on the part of the government agent entering the contract."  Suess v. United States, 535 F.3d 1348, 1359 (Fed. Cir. 2008); accord Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1326 (Fed. Cir. 1997).  Here, plaintiff generally alleges that the promise of cost-sharing reduction payments set forth in 42 U.S.C. § 18071(c)(3)(A) induced it to offer qualified health plans on the exchange, and that by offering such plans, it accepted the government's offer and entered into unilateral contract.  Alternatively, plaintiff contends that it entered into bilateral contracts with the government, culminating in the execution of the QHPI Agreements, in which the parties agreed that plaintiff was required to offer cost-sharing reductions to its eligible insureds.[20]  In response, defendant argues that plaintiff has not established the existence of a valid implied-in-fact contract with the government for three reasons:  the Affordable Care Act did not create an implied-in-fact contract to make cost-sharing reduction payments, HHS lacks the authority to enter into a contract to make cost-sharing reduction payments, and the QHPI Agreements preclude the existence of an implied-in-fact contract to make cost-sharing reduction payments.

The court first addresses plaintiff's contention that 42 U.S.C. § 18071(c)(3)(A) is an offer to make cost-sharing reduction payments to insurers that offered qualified health plans on the exchanges.  The Supreme Court has provided the following guidance:

[A]bsent some clear indication that the legislature intends to bind itself contractually, the presumption is that "a law is not intended to create private

---

[20]  The difference between unilateral and bilateral contracts was explained in the Restatement (First) of Contracts:  "A unilateral contract is one in which no promisor receives a promise as consideration for his promise.  A bilateral contract is one in which there are mutual promises between two parties to the contract; each party being both a promisor and a promisee."  Restatement (First) of Contracts § 12 (Am. Law Inst. 1931).  However, that terminology was removed from the Restatement (Second) of Contracts.  See Restatement (Second) of Contracts § 1 cmt. f (Am. Law Inst. 1981) ("Section 12 of the original Restatement defined unilateral and bilateral contracts.  It has not been carried forward because of doubt as to the utility of the distinction, often treated as fundamental, between the two types.").  Given the court's resolution of plaintiff's claim, the distinction is not relevant in this case.

contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." This well-established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state. Policies, unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body. . . . Thus, the party asserting the creation of a contract must overcome this well-founded presumption, and we proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation.

Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co., 470 U.S. 451, 465-66 (1985) (citations omitted) (quoting Dodge v. Bd. of Educ., 302 U.S. 74, 79 (1937)); accord Moda Health Plan, 892 F.3d at 1329; Brooks v. Dunlop Mfg. Inc., 706 F.3d 624, 630-31 (Fed. Cir. 2012).

To determine whether 42 U.S.C. § 18071(c)(3)(A) "gives rise to a contractual obligation, 'it is of first importance to examine the language of the statute.'" Nat'l R.R. Passenger Corp., 470 U.S. at 466 (quoting Dodge, 302 U.S. at 78); accord Brooks, 706 F.3d at 631. Plaintiff does not, and cannot, contend that the statute alone contains language manifesting an intent to contract. Rather, it asserts that the combination of the statute, the implementing regulations, and the government's conduct in making cost-sharing reduction payments until October 2017 reflects the parties' intent to contract. In support of its position, plaintiff relies primarily on Radium Mines, Inc. v. United States, 153 F. Supp. 403 (Ct. Cl. 1957). In that case, the United States Atomic Energy Commission issued a regulation titled "Ten Year Guaranteed Minimum Price," which provided:

To stimulate domestic production of uranium and in the interest of the common defense and security the United States Atomic Energy Commission hereby establishes the guaranteed minimum prices specified in paragraph (b) of this section, for the delivery to the Commission, in accordance with the terms of this section during the ten calendar years following its effective date . . . , of domestic refined uranium, high-grade uranium-bearing ores and mechanical concentrates, in not less than the quantity and grade specified in paragraph (e) of this section.

Id. at 404 (quoting 10 C.F.R. § 60.1(a) (1949)). The court rejected the defendant's contention that the regulation was "a mere invitation to the industry to make offers to the Government" and instead agreed with the plaintiff that the regulation "was an offer, which ripened into a contract when it was accepted by the plaintiff's putting itself in a position to supply the ore or the refined uranium described in it." Id. at 405.

The argument raised by plaintiff here is similar to the one advanced by the plaintiff in Moda Health Plan with respect to the risk corridors program. The risk corridors program was one of three programs established in the Affordable Care Act to mitigate the risk faced by insurers "and discourage insurers from setting higher premiums to offset that risk," Moda Health

Plan, 892 F.3d at 1314, pursuant to which the Secretary of HHS was required to make annual payments to insurers in accordance with a statutory formula, id. at 1320; 42 U.S.C. § 18062.  The United States Court of Appeals for the Federal Circuit concluded in Moda Health Plan that "the overall scheme of the risk corridors program lacks the trappings of a contractual arrangement that drove the result in Radium Mines," explaining:

> [In Radium Mines], the government made a "guarantee," it invited uranium dealers to make an "offer," and it promised to "offer a form of contract" setting forth "terms" of acceptance.  Not so here.
>
> The risk corridors program is an incentive program designed to encourage the provision of affordable health care to third parties without a risk premium to account for the unreliability of data relating to participation of the exchanges— not the traditional quid pro quo contemplated in Radium Mines.  Indeed, an insurer that included that risk premium, but nevertheless suffered losses for a benefit year as calculated by the statutory and regulatory formulas would still be entitled to seek risk corridors payments.

892 F.3d at 1330 (citations omitted).  It further observed that the dispute in Radium Mines was distinguishable:

> [T]he parties in Radium Mines, one of which was the government, never disputed that the government intended to form some contractual relationship at some time throughout the exchange.  The only question there was whether the regulations themselves constituted an offer, or merely an invitation to make offers.  Radium Mines is only precedent for what it decided.

Id.  Accordingly, it concluded that "no statement by the government evinced an intention to form a contract" to make risk corridors payments, and that "[t]he statute, its regulations, and HHS's conduct all simply worked towards crafting an incentive program."  Id.

The risk corridors program differs from the cost-sharing reduction program in one significant manner:  in the risk corridors program, insurers receive payments as an incentive to lower their premiums, while in the cost-sharing reduction program, insurers are reimbursed by the government for cost-sharing reductions that they are statutorily required to make.  In other words, the cost-sharing reduction program is less of an incentive program and more of a quid pro quo.  Accordingly, that aspect of Moda Health Plan's analysis is inapplicable in this case.[21]

In fact, although 42 U.S.C. § 18071(c)(3)(A) and its implementing regulation (45 C.F.R. § 156.430) do not include language traditionally associated with contracting, such as "offer," "acceptance," "consideration," or "contract," the parties' intent to enter into a contractual

---

[21]  Nevertheless, Moda Health Plan precludes the court from relying on Radium Mines because, unlike in Radium Mines, the parties in this case dispute whether the government intended to form a contractual relationship for the reimbursement of insurers' cost-sharing reductions.

relationship can be implied from the quid pro quo nature of the cost-sharing reduction program, plaintiff's offering of qualified health plans on the exchange with the mandated cost-sharing reductions, and the government's reimbursement of plaintiff's cost-sharing reductions from January 2014, when the payments first became due, until October 2017.  <u>Accord</u> <u>Aycock-Lindsey Corp. v. United States</u>, 171 F.2d 518, 521 (5th Cir. 1948) (holding that when the head of the pertinent agency "published bulletins and promulgated rules providing for the payment of subsidies to those . . . who accepted the offer by voluntarily coming under, and complying with, the [relevant] Act, there was revealed the traditional essentials of a contract, namely, an offer and an acceptance, to the extent that we should hesitate to hold that there was not at least an implied contract to pay subsidies," and further holding that "[i]n view of the numerous requirements for the [plaintiff] to put himself in position to receive the payments, we regard the subsidies not as gratuities but as compensatory in nature"), <u>cited in</u> <u>Army & Air Force Exch. Serv. v. Sheehan</u>, 456 U.S. 728, 740 n.11 (1982) (identifying <u>Aycock-Lindsey</u> as a decision in which a contract was "inferred from regulations promising payment").  In other words, the government offered to reimburse insurers for their mandated cost-sharing reductions, plaintiff accepted that offer by offering the qualified health plans with reduced cost-sharing obligations, and consideration was exchanged (plaintiff supplied qualified health plans that helped the government reduce the number of uninsured individuals, and the government made cost-sharing reduction payments to plaintiff).[22]

Moreover, contrary to defendant's contention, the Secretary of HHS and his delegate, the Administrator of CMS, possessed the authority to enter into a contract with insurers to make cost-sharing reduction payments.  Implied-in-fact contracts with the United States can only be made by "an authorized agent of the government."  <u>Trauma Serv. Grp.</u>, 104 F.3d at 1326; <u>accord</u> <u>Kania v. United States</u>, 650 F.2d 264, 268 (Ct. Cl. 1981) ("The claimant for money damages for breach of an express or implied in fact contract must show that the officer who supposedly made the contract had authority to obligate appropriated funds.").  Specifically, "the Government representative 'whose conduct is relied upon must have actual authority to bind the government in contract.'"  <u>City of El Centro v. United States</u>, 922 F.2d 816, 820 (Fed. Cir. 1990) (quoting <u>Juda v. United States</u>, 6 Cl. Ct. 441, 452 (1984)).  Actual authority may be express or implied.  <u>See</u> <u>Salles v. United States</u>, 156 F.3d 1383, 1384 (Fed. Cir. 1998); <u>H. Landau & Co. v. United States</u>, 886 F.2d 322, 324 (Fed. Cir. 1989).  "Authority to bind the [g]overnment is generally implied when such authority is considered to be an integral part of the duties assigned to a [g]overnment employee."  <u>H. Landau & Co.</u>, 886 F.2d at 324 (quoting John Cibinic, Jr. & Ralph C. Nash, Jr., <u>Formation of Government Contracts</u> 43 (1982)) (alteration in original); <u>see also</u> <u>United States v. Winstar Corp.</u>, 518 U.S. 839, 890 n.36 (1996) ("The authority of the executive to use contracts in carrying out authorized programs is . . . generally assumed in the absence of express statutory prohibitions or limitations[.]" (quoting 1 Ralph C. Nash, Jr. & John Cibinic, Jr., <u>Federal Procurement Law</u> 5 (3d ed. 1977))).

There can be no doubt that making cost-sharing reduction payments is an integral part of the duties assigned to the Secretary of HHS because the Secretary of HHS is required to make such payments pursuant to 42 U.S.C. § 18071(c)(3)(A).  Defendant contends, however, that in accordance with the Antideficiency Act, the Secretary of HHS lacks actual authority to contract

---

[22]  Defendant does not contend that there was a lack of consideration.

for the reimbursement for cost-sharing reductions.  The court is not persuaded.  The Antideficiency Act provides that a government "officer or employee . . . may not . . . involve [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law[.]"  31 U.S.C. § 1341(a)(1)(B).  The reimbursement of cost-sharing reductions is authorized by law—42 U.S.C. § 18071(c)(3)(A).  Thus, the Antideficiency Act's prohibition is inapplicable in this case.  Accord N.Y. Airways, 369 F.2d at 752 ("Since it has been found that the [agency's] action created a 'contract or obligation (which) is authorized by law', obviously the statute [prohibiting contract obligations in excess of appropriated funds] has no application to the present situation . . . .").  In short, the Secretary of HHS possesses at least the implied actual authority to contractually bind the government to make cost-sharing reduction payments.

Defendant further contends that the QHPI Agreements executed by plaintiff and CMS preclude the existence of an implied-in-fact contract to make cost-sharing reduction payments.  As defendant notes, "[t]he existence of an express contract precludes the existence of an implied contract dealing with the same subject, unless the implied contract is entirely unrelated to the express contract."  Atlas Corp. v. United States, 895 F.2d 745, 754-55 (Fed. Cir. 1990), cited in Schism v. United States, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (en banc); see also Klebe v. United States, 263 U.S. 188, 192 (1923) ("A contract implied in fact is one inferred from the circumstances or acts of the parties; but an express contract speaks for itself and leaves no place for implications.").  However, the QHPI Agreements only address the reconciliation of cost-sharing reduction payments, and do not create any duties or obligations to make cost-sharing reduction payments in the first instance.[23]  The relevant provision set forth under the "CMS Obligations" heading—"As part of a monthly payments and collections reconciliation process, CMS will recoup or net payments due to [plaintiff] against amounts owed to CMS by [plaintiff] in relation to offering of [Qualified Health Plans] . . . including . . . advance payments of [Cost-Sharing Reductions]," Agreements 6—merely requires CMS, as part of a monthly reconciliation process, to make payments to insurers that underestimated their cost-sharing obligations and collect payments from insurers who overestimated their cost-sharing obligations.  See Nw. Title Agency, Inc. v. United States, 855 F.3d 1344, 1347 (Fed. Cir. 2017) ("When the contract's language is unambiguous it must be given its 'plain and ordinary' meaning . . . ." (quoting Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (en banc))).  Indeed, CMS could not "recoup or net payments" to an insurer unless the government had already made an advance cost-sharing reduction payment to the insurer.

Moreover, the relevant provision in the QHPI Agreements' recitals—"[i]t is anticipated that periodic . . . advance payments of [Cost-Sharing Reductions] . . . will be due between CMS and [plaintiff]," Agreements 1— is not a promise to make advanced cost-sharing reduction payments but is merely an expression that such payments were expected.  See Nat'l By-Prod., Inc. v. United States, 405 F.2d 1256, 1263 (Ct. Cl. 1969) ("Before a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere

---

[23]  Defendant ultimately concedes this point in its reply brief.  See Def.'s Reply 10 ("The Government agrees with plaintiff that the QHP[I] Agreements do not establish a contract for the payment of [cost-sharing reductions].").

statement of intention, opinion, or prediction."). In fact, it forms the factual predicate for the provision describing CMS's reconciliation obligations.

Furthermore, the QHPI Agreements mostly address the privacy and security obligations set forth in 45 C.F.R. § 155.260. Accordingly, the QHPI Agreements concern a subject entirely unrelated to the purported implied-in-fact contract, and therefore do not preclude the finding of an implied-in-fact contract.

In sum, plaintiff has established the existence of an implied-in-fact contract to make cost-sharing reduction payments. Thus, the court also must determine whether plaintiff has established that the government has breached the implied-in-fact contract. "To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989); accord Trauma Serv. Grp., 104 F.3d at 1325 ("To prevail, [plaintiff] must allege facts showing both the formation of an express contract and its breach."). Plaintiff has established the existence of a valid contract, a government obligation to make cost-sharing reduction payments, and the government's failure to make such payments, leaving only the issue of damages.

"The general rule in common law breach of contract cases is to award damages that will place the injured party in as good a position as he or she would have been [in] had the breaching party fully performed." Estate of Berg v. United States, 687 F.2d 377, 379 (Ct. Cl. 1982). Thus, the injured party "must show that but for the breach, the damages alleged would not have been suffered." San Carlos Irrigation & Drainage Dist., 111 F.3d at 1563; accord Boyajian v. United States, 423 F.2d 1231, 1235 (Ct. Cl. 1970) (per curiam) ("Recovery of damages for a breach of contract is not allowed unless acceptable evidence demonstrates that the damages claimed resulted from and were caused by the breach."). "One way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred." Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001). These expected benefits—expectancy damages—"are recoverable provided they are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty." Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001); accord Fifth Third Bank v. United States, 518 F.3d 1368, 1374-75 (Fed. Cir. 2008).

The injured party has the burden of proving damages caused by the breach of contract. See Northrop Grumman Computing Sys., Inc. v. United States, 823 F.3d 1364, 1368 (Fed. Cir. 2016); accord Bluebonnet Sav. Bank FSB v. United States, 67 Fed. Cl. 231, 238 (2005) (explaining that a plaintiff has the burden to prove expectancy damages by demonstrating what would have happened but for defendant's breach of contract), aff'd, 466 F.3d 1349 (Fed. Cir. 2006). The burden then shifts to the breaching party to establish "that plaintiff's damages claims should be reduced or denied." Duke Energy Progress, Inc. v. United States, 135 Fed. Cl. 279, 287 (2017). Here, plaintiff has shown that but for the government's breach, it would have received the full amount of the cost-sharing reduction payments to which it was entitled; there is no dispute that plaintiff's damages were foreseen, caused by the government's breach, and can be determined with reasonable certainty. Defendant has not attempted to rebut plaintiff's claim

-25-

of breach-of-contract damages, either through argument or evidence.[24]  Accordingly, plaintiff has established its entitlement to breach-of-contract damages in the amount of the unpaid cost-sharing reduction reimbursements.

## IV.  CONCLUSION

For the reasons set forth above, the court concludes that the government's failure to make cost-sharing reduction payments to plaintiff violates 42 U.S.C. § 18071 and constitutes a breach of an implied-in-fact contract.  Therefore, it **GRANTS** plaintiff's motion for summary judgment and **DENIES** defendant's motion to dismiss.  By **no later than Thursday, February 28, 2019**, the parties shall file a joint status report indicating the amount due to plaintiff for the cost-sharing payments it did not receive for 2017.[25]  In addition, if plaintiff intends to pursue a claim for unpaid cost-sharing reduction reimbursements for 2018, the parties shall indicate what, if any, further proceedings may be required.  If the parties represent that plaintiff does not intend to pursue a claim for 2018 in these proceedings, then the court will direct the entry of judgment based on the amount due for 2017.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge

---

[24]  In arguing that the government did not violate 42 U.S.C. § 18071(c)(3)(A), defendant asserts that insurers' ability to increase premiums for their silver-level qualified health plans to obtain greater premium tax credit payments, and thus offset any losses resulting from the nonpayment of cost-sharing reduction reimbursements, is evidence that Congress did not intend to provide a statutory damages remedy for the government's failure to make the cost-sharing reduction payments.  However, defendant did not advance a similar argument in responding to plaintiff's breach-of-contract claim.

[25]  Plaintiff alleges in its complaint (and asserts in the its motion for summary judgment) that it is owed $5,651,672.49 for 2017.  However, plaintiff did not supply any evidence in support of that amount.